**Christopher Lundberg,** OSB No. 941084
email: clundberg@hk-law.com
**Matthew E. Malmsheimer,** OSB No. 03384
email: mmalmsheimer@hk-law.com
**HAGLUND KELLEY LLP**
200 S.W. Market Street, Suite 1777
Portland, Oregon 97201
Phone: (503) 225-0777
Facsimile: (503) 225-1257

Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

(Eugene Division)

| | |
|---|---|
| **JOHN S. UMENHOFER, an individual,** | Case No.: |
| Plaintiff, | **COMPLAINT** |
| v. | Violations of 42 U.S.C. § 1983 (Free Speech Rights under the First and Fourteenth Amendments to the U.S. Const.), Public Employee Whistleblower Retaliation in Violation of 659A.200 *et seq.*; Violations of 659A.218 and ORS 659A.103 |
| **GINO GRIMALDI, TIMOTHY DONEY, individuals, and THE CITY OF SPRINGFIELD, an Oregon Municipality** | |
| Defendants. | |
| | Jury Trial Demanded |

## INTRODUCTION

This case arises out of plaintiff John Umenhofer's several-year battle to fix corruption

within the Springfield Police Department ("SPD" or the "Department"). The corruption

involved the Department's practice of allowing misconduct and silencing those who attempted to

challenge it. Sgt. Umenhofer initially understood the misconduct to revolve around

inappropriate, on-duty, sexual interactions among some of the Department's leadership team,

some of which involved relationships with female subordinates and City co-workers – and he

Page 1 – COMPLAINT

kept his reports internal, hoping and trusting that the senior Department leaders would respond appropriately.

However, as he learned, the corruption went all the way to the Chief's office, negatively impacted police operations, and leaked into other areas of misconduct that put the public's safety at risk. As a result, Sgt. Umenhofer determined to take a stand against this culture, knowing that if it was not stopped, it would escalate. Unfortunately, Sgt. Umenhofer's sustained efforts to rid the Department of this culture triggered retaliatory hostility from his supervisors that put his personal safety in danger and caused him severe distress and anxiety. As a result, he was forced to go outside the Department with his complaints.

In that regard, Sgt. Umenhofer took his complaints to Gino Grimaldi, the City of Springfield's City Manager, and to the Mayor of Springfield. Sgt. Umenhofer knew that by doing so, he was crossing a dangerous line. Accordingly, he urged Mr. Grimaldi to keep his identity, and the identity of the line officers who had made similar reports to Sgt. Umenhofer, confidential. Notwithstanding Sgt. Umenhofer's cautions (and Oregon law), Mr. Grimaldi provided Sgt. Umenhofer's and the other reporting officers' identities, along with the notebook containing detailed documentation of the misconduct, to the Chief and other supervising officers identified by Sgt. Umenhofer as corrupt.

Almost immediately thereafter, Sgt. Umenhofer was subjected to retaliatory hostility, which in the light of his previous experience with the same, caused his mental and physical health to deteriorate to the point that he needed an extended medical leave of absence, which was unpaid. When the City hired a new Chief of Police, Tim Doney, Sgt. Umenhofer presented his notebook to Chief Doney and urged him to take corrective action. In response, the new Chief failed to even acknowledge Sgt. Umenhofer's concerns. Instead, Chief Doney rather simply, and

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
0000029911H073PL01

tellingly, told Sgt. Umenhofer that retirement would be a good thing. A few months later, Sgt. Umenhofer requested to return to work with an accommodation designed to ensure his safety, which could have included a short-or-long term transfer to an open Investigator's position within the District Attorney's office, a position with the Interagency Drug Team located within the Drug Enforcement Agency, or the Director of the Springfield municipal jail, all of which were commensurate with his skills and abilities. Instead, the City offered him a janitorial or librarian job. When Sgt. Umenhofer declined to accept those "offers," the City fired him.

## JURISDICTION

1.      This Court has original jurisdiction over Plaintiff's federal statutory claims under 28 U.S.C. § 1331. This Court has supplemental jurisdiction over Plaintiff's pendant state claims under 28 U.S.C. § 1367.

## VENUE

2.      Venue is appropriate in the District of Oregon, Eugene Division, because all of the Defendants reside within the State of Oregon and all of the events giving rise to this action occurred in Lane County in the State of Oregon. 28 U.S.C. § 1391(b).

## PARTIES

3.      Plaintiff John S. Umenhofer is an individual and resident of Springfield, Oregon. At all times material, Plaintiff worked as a Sergeant in the Springfield Police Department. At the time of termination, Sgt. Umenhofer was earning approximately $95,000 per year (excluding overtime pay), with health and other insurance benefits and a monthly employer contribution to his retirement account equal to 12.8% of his monthly earnings. The retirement account earned a guaranteed interest rate of 9%. The interest rate earnings ended one year after Sgt. Umenhofer's termination and were calculated off of his most recent wage rate.

Page 3 – COMPLAINT

4.      Defendant Gino Grimaldi is an individual and, upon information and belief, resident of Springfield, Oregon.  At all times material, Mr. Grimaldi served as the City Manager of the City of Springfield, and thus his actions towards Sgt. Umenhofer were taken under color of state law.  Mr. Grimaldi is being sued in both his individual and official capacities.

5.      Defendant Timothy Doney is an individual and, upon information and belief, resident of Springfield, Oregon.  At all times material, Chief Doney served as the Chief of Police for the Springfield Police Department, and thus his actions towards Sgt. Umenhofer were taken under color of state law.  Chief Doney is being sued in his official capacity.

6.      Defendant City of Springfield (the "City") is an Oregon Municipality.  At all times material, it acted by and through its employees and agents, who were acting within the course and scope of their employment and authority and in furtherance, at least in part, of the City's interests.

## FACTS

7.      As of his termination on June 9, 2014, Sgt. Umenhofer was a veteran Patrol Sergeant with 29-years' service with the Department.

8.      Sgt. Umenhofer was a consistently strong performer in his police work.  He served on the Department's Special Weapons and Tactics ("SWAT") team for twenty years and was awarded numerous honors, including being voted Officer of the Year by his peers, being recognized as the top-arresting officer in the Department, and receiving the Medal of Valor and a Lifesaving Medal.

9.      Sgt. Umenhofer was a certified law enforcement ethics instructor and for several years taught an ethics class to law enforcement reserve personnel.

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
0000029911H073PL01

10.     Over the course of his career as a supervisor, Sgt. Umenhofer earned a reputation for high ethical standards among his peers.

11.     On or around January 3, 2003, the City promoted Sgt. Umenhofer to a supervisory position of sergeant.

12.     After his promotion, Sgt. Umenhofer periodically received reports from line officers about their concerns pertaining to several officers' perceived unethical and illegal conduct.

13.     Initially, Sgt. Umenhofer forwarded these complaints internally, following the appropriate chain of command and complaint process.

14.     In response, SPD's leadership, including its captains and its chief, consistently met Sgt. Umenhofer's complaints with resistance, reluctantly conducted inadequate and results driven investigations, and subjected Sgt. Umenhofer to retaliatory hostility.

15.     Other officers experienced retaliation for reporting misconduct of their peers and observed that SPD leadership had established a culture in which officers who spoke out against misconduct of other officers would be retaliated against.

16.     Based upon the experience of Sgt. Umenhofer and other officers, SPD had established an unwritten policy of responding to good-faith reports of misconduct by officers or staff members by attempting to silence the reporting officers or staff members and covering up the subject officer's misdeeds.

17.     Sgt. Umenhofer first became aware of the extent of this cover-up policy and practice when in 2007 he reported a concern about the unethical and potentially criminal conduct of Detective Scott James and the failure of SPD to adequately investigate and handle that situation.

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
0000029911H073PL01

18.     The origin of this concern came by way of a citizen complaint.  In that regard, on or about March 5, 2007, a civilian reported seeing a man and a woman engaged in sexual activity in the parking lot of a church.  The complaint implicated two criminal laws:  Public Indecency – ORS 163.465 and Official Misconduct – ORS 162.415.  Two SPD patrol officers had responded to the call, and identified the male subject as Detective Scott James and that the activity had occurred in an unmarked SPD car, which matched the description given by the civilian.

19.     This situation was reported to Capt. Richard Harrison, who, along with Sgt. Charboneau conducted a cursory investigation and then transferred Detective James to a patrol position.  Capt. Harrison's response was inconsistent with past practice under similar circumstances, which typically triggered a suspension with pay and an investigation by an outside agency.

20.     After learning of Capt. Harrison's response, several patrol officers told Sgt. Umenhofer of their concern that SPD was covering up Detective James' misconduct.

21.     Sgt. Umenhofer agreed that the situation warranted a stronger reaction because, among other reasons, Detective James' conduct, if substantiated, violated his ethical duties as mandated by Oregon law and administered by the Oregon Department of Public Safety Standards and Training ("DPSST").

22.     As a result, Sgt. Umenhofer took his and the other officers' concerns to Capt. Richard Lewis.  Sgt. Umenhofer told Capt. Lewis that several of the patrol officers perceived this situation as involving criminal activity and that SPD's decision simply to transfer Detective James' to patrol was an inadequate response.  Sgt. Umenhofer also told Capt. Lewis that the department's mishandling of this situation was affecting the efficient operation of the patrol

Page 6 –  COMPLAINT

division.  For these reasons, Sgt. Umenhofer urged Capt. Lewis to conduct a proper

investigation.

23.    Capt. Lewis's response was to dismiss Sgt. Umenhofer's concerns, telling him,

"You're just jealous."

24.    A short time later, a SPD sergeant told Sgt. Umenhofer that the investigation into

Detective James' conduct by Capt. Harrison and Sgt. Charboneau looked like a cover-up.  This

same sergeant informed Sgt. Umenhofer that Capt. Harrison had allegedly been seen engaging in

sexual activity while on duty in SPD's weight room, and that Sgt. Charboneau had been using his

command vehicle to facilitate an affair with a Lane County Sheriff's Office deputy's wife.  The

sergeant explained that because of Capt. Harrison's and Sgt. Charboneau's on-duty sexual

conduct, it was a conflict of interest for them to investigate Detective James.

25.    Based on this information, Sgt. Umenhofer contacted a Lane County Assistant

District Attorney, who recommended that an outside agency should investigate the situation.

Before speaking with Chief Jerry Smith about that recommendation, the Assistant District

Attorney contacted the complaining citizen to get more information.

26.    The citizen confirmed that on the day of his complaint, he had a "straight view" of

the couple, and that he had observed the woman's "head . . . bobbing on [Detective James'] lap."

The citizen also said that he had seen this same couple there on numerous previous occasions

over the past eighteen months, and that he was "disgusted" by the sexual conduct in that public

place because children would often cross and play in that church parking lot.

27.    Based on the Assistant District Attorney's recommendation, in or around May

2007, Chief Smith ordered a second investigation by the Oregon State Patrol, but limited that

investigation to the single incident, rather than the scope and duration of Detective James' long-

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
0000029911H073PL01

term affair.  Surprisingly, the second investigation failed to substantiate whether Detective

James' was engaged in sexual activity on the day in question, which had the effect of allowing

him to continue his on-the-job sexual impropriety for another three years.

28.    On or about June 20, 2007, Captain Lewis and Chief Smith requested a meeting

with Sgt. Umenhofer.  At that meeting, Captain Lewis and Chief Smith chastised Sgt.

Umenhofer for not "letting [the situation with Detective James] go."  Sgt. Umenhofer explained

that his concern was about ensuring that SPD officers maintain proper ethical standards, as

required by DPSST and SPD's internal policies and standards.

29.    In response, Captain Lewis and Chief Smith told him that some other officers

were upset with Sgt. Umenhofer for pushing this issue and that he should drop it.  Sgt.

Umenhofer explained that he would not drop it because he believed that SPD's leadership had a

big ethical problem.

30.    In or around January 2008, a friend of former Detective James, Tiffany Monroe,

who was also a member at Springfield Police Association's executive board, served as editor of

the department newsletter.   The newsletter issued at that time contained comments along the

lines of:  "You can't find god in a church parking lot."

31.    Sgt. Umenhofer believed those comments were referencing former Detective

James' conduct and mocking the ethical violations associated with the same.  Hence, Sgt.

Umenhofer reported his concerns to Chief Smith, who took no action in response.

32.    Given the complete lack of concern by SPD's leadership about ensuring that its

officers complied with the applicable ethical rules governing the conduct of law enforcement

personnel, Sgt. Umenhofer grew concerned that the Department's culture of allowing

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
0000029911H073PL01

misconduct had and would negatively impact other aspects of SPD's operations, including the public's safety.

33.    Sgt. Umenhofer's concerns about SPD's culture of corruption were confirmed in connection with the conduct of an SPD Officer, Ethan Spencer, and SPD's leadership's failure to properly respond.

34.    In that regard, before the James' situation described above, in or around the spring of 2005, two officers had approached Sgt. Umenhofer with serious concerns about the mental stability of Officer Ethan Spencer.  The officers reported their concern that Officer Spencer seemed fixated on killing someone, and as a result, that they did not want to work with or go on any calls with Officer Spencer.  Sgt. Umenhofer took those concerns to Captain Lewis and Chief Smith.  However, nothing was done.

35.    On or about June 26, 2005, Officer Spencer shot and killed an unarmed fifteen year old.

36.    An investigation into the shooting cleared Officer Spencer of wrongdoing. However, based upon information and belief, the investigative team did not interview the officers who had reported their concerns about Officer Spencer's mental instability, nor were those concerns ever relayed to the investigative team.  Nonetheless, Officer Spencer was allowed to continue serving as a police officer and later became a member of the SWAT team based on the approval of Capt. Lewis.

37.    The mishandling of the Spencer investigation contributed to two officers' decision to leave SPD.

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
0000029911H073PL01

38.     During the investigation, Sgt. Umenhofer told Detective Dave Lewis that Officer Spencer was unstable.  In response, Detective Lewis agreed that there were problems with the shooting but dismissed those concerns by stating that the victim was a "maggot."

39.     Detective Dave Lewis and Captain Richard Lewis are brothers.

40.     Detective Dave Lewis and Officer Ethan Spencer were close friends.

41.     In 2008, Chief Smith promoted Detective Lewis to sergeant without requiring him to go through any promotion testing or any competitive process at all.

42.     On or about October 30, 2008, Sgt. Umenhofer was present at a police shooting incident.  During that encounter, Officer Spencer left his cover location, approached the suspect while shooting his hand gun.  This action put Officer Spencer in a crossfire situation with SWAT officers, which Officer Spencer later denied by suggesting that he moved out of the crossfire lines before approaching the suspect.  As Sgt. Umenhofer knew this to be untrue, he advised Sgt. Dave Lewis and Captain Richard Lewis that Officer Spencer had been untruthful and that he should be removed from the SWAT team for his reckless behavior.   Nothing was done.

43.     In or around 2009, SPD became aware of a website that contained racially derogatory statements about Latinos and that posted internal SPD disciplinary memos.

44.     Former Detective Scott James had started the website.

45.     Before Capt. Lewis knew that former Detective James had started the website, Capt. Lewis told officers that the officer responsible for the website would be fired.

46.     However, when it became known that the responsible individual was former Detective James, Capt. Lewis took no action.

47.     As a result, Sgt. Umenhofer reported his concerns about the inadequate handling of former Detective James and his website to his immediate supervisor, Mike Harmon.  Sgt.

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
0000029911H073PL01

Umenhofer reported that he was concerned about retaliation for pushing this issue, given what he had experienced before, and that the website and the department's failure to adequately respond was creating division among the patrol officers.

48.    Supervisor Harmon forwarded Sgt. Umenhofer's written complaint directly to Capt. Lewis.

49.    Notwithstanding, SPD did not take any apparent disciplinary action against former Detective James.  Instead, SPD placed him on the oral boards to select new officers.

50.    A short time later, in or around July 2009, Capt. Harrison told Sgt. Umenhofer that someone "had dropped a dime" on him about a damaged Lidar unit, and then Capt. Harrison berated Sgt. Umenhofer for failing to perform his duty.

51.    Sgt. Umenhofer was not working on the day in question.

52.    In or around September 2009, Sgt. Umenhofer experienced another incident that caused him concern about the impact of the Department's culture of corruption on the public's safety.  At that time, Sgt. Umenhofer had responded to a call of a reported rape.  The victim had been kidnapped and dragged into an area of trees and brush near a freeway overpass.  She had been sexually assaulted and had ligature marks around her neck, the result of having been choked until she blacked out.  Sgt. Umenhofer called Detective Sergeant Charboneau and requested assistance to properly investigate the scene where the victim had been found and to canvas the party where he believed the victim had met her attacker (or attackers).  Sgt. Charboneau, who was in charge of the detective division, not only failed to send sufficient detectives to properly investigate the crime, he also declined to respond to the scene himself.  The detective who did respond contaminated evidence where the victim had been found.

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
0000029911H073PL01

53.     Later, in an apparent effort to cover-up the Department's mishandling of that investigation, Capt. Harrison told the lead officer at the scene that the victim had not been raped. The lead officer disagreed with Capt. Harrison's statement. Notwithstanding, the media reported that SPD believed the victim had not been raped.

54.     Sgt. Umenhofer complained to Capt. Lewis (who was Sgt. Charboneau's direct supervisor) about Sgt. Charboneau's mishandling of the case and wrote an email to stop the dissemination of more incorrect information.

55.     A short time later, on or about September 18, 2009, Capt. Harrison berated Sgt. Umenhofer for contacting a second detective on the night of the attempted murder/rape. Capt. Harrison also demanded that Sgt. Umenhofer was not to follow chain of command when a complaint involved Sgt. Charboneau.   Instead, Sgt. Umenhofer was only to report such a complaint to Capt. Harrison.

56.     In or around December 2009, Capt. Harrison assigned Sgt. Umenhofer to graveyard shift despite Sgt. Umenhofer's request to work nights or days and despite two other sergeants having requested graveyard shifts.

57.     On or about February 2010, Chief Smith angrily approached Sgt. Umenhofer in the locker room. Chief Smith told Sgt. Umenhofer that at a recent arbitration hearing involving a fired employee, a witness testified that Sgt. Umenhofer had said that there was a cover-up regarding the investigation into former Detective James' sexual misconduct. Chief Smith angrily admonished Sgt. Umenhofer, stating that: "We got the Scott James issue rammed up our ass."

58.     Chief Smith further admonished Sgt. Umenhofer by instructing him that: "We need to not run our mouths."

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
0000029911H073PL01

59.     A few days later, Capt. Harrison found Sgt. Umenhofer, sat down across from him, looked him in the eye, and angrily stated: "Fucking Nazi!"  Capt. Harrison then got up and abruptly left.

60.     On or about February 14, 2010, former Detective James' mistress contacted Sgt. Umenhofer with a concern that former Detective James was violating a no-contact order SPD had issued.  At that time, she admitted that on numerous occasions while former Detective James had been on duty, they had engaged in sexual activity, and that he had started the offensive web site described above.

61.     Although she had never met Sgt. Umenhofer, the woman also stated that she felt she could only trust Sgt. Umenhofer.

62.     Sgt. Umenhofer reported this information to Chief Smith.  Sgt. Umenhofer also told him that former Detective James likely told her that Chief Smith, Capt. Harrison and Sgt. Charboneau were all engaging in sexual activity while on duty, and that former Detective James was trying to photograph Chief Smith with a City employee with whom Chief Smith was having an affair.  As to the affair, Chief Smith denied that he was having any affair.

63.     A few days later, former Detective James resigned under threat of termination.

64.     Around the same time, Sgt. Umenhofer learned that former Detective James said that he could see how someone could get so mad they could kill somebody.  Chief Smith also advised Sgt. Umenhofer to "watch his back."

65.     Also around the same time, Sgt. Rappe admonished Sgt. Umenhofer for taking action on the complaint from former Det. James' mistress.

66.     This admonishment concerned Sgt. Umenhofer because Sgt. Rappe had engaged in similar misconduct, which reinforced the problem associated with a department plagued with

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
0000029911H073PL01

compromised supervisors not willing to take appropriate corrective action. In that regard, Sgt. Rappe had engaged in sexual liaisons with another officer's wife on SPD's premises, one of which included Sgt. Rappe having sex in the Municipal Judge's office. Sgt. Rappe ultimately acknowledged his misconduct and apologized to the other officers for its impact on their morale.

67.     On or about February 18, 2010, Capt. Harrison wrote Sgt. Umenhofer an email demanding to know why he left Capt. Harrison out of the complaint process involving former Detective James and sought legal advice outside of the department. Sgt. Umenhofer responded by stating that Capt. Harrison had a conflict of interest.

68.     On or about February 19, 2010, Capt. Harrison called Sgt. Umenhofer into his office. Chief Smith was also present. Capt. Harrison demanded to know what the "conflict" was, and Sgt. Umenhofer told him that it was Capt. Harrison's long-term, on-duty sexual conduct with an employee in the City's human resources department. Sgt. Umenhofer also told Chief Smith and Capt. Harrison that he was "fed up" with taking a stand on misconduct and then being retaliated against for doing so.

69.     A short time later, Officer Scott Akins, who was the Police Association's president and friend of former Detective James, threatened to "go after" Sgt. Umenhofer. Consistent with that threat, members of the E-Board attempted to advance a letter condemning Sgt. Umenhofer's actions in taking the complaint of former Detective James' mistress.

70.     At a meeting of the Police Association during which this letter was discussed, several senior SPD officers expressed their disagreement with the letter. Capt. Harrison's ethical issues and the inability of the department to "police itself" were also discussed, citing as an example the situation involving Capt. Harrison's twin brother, ex-officer Rod Harrison, who

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
0000029911H073PL01

failed to do any prison time despite having been found with thousands of pictures of naked children on his police computer.

71.     On or about March 12, 2010, Capt. Harrison provided Sgt. Umenhofer with his annual performance review.  The review was two months late, contained no outstanding marks, and cited as problematic Sgt. Umenhofer's actions in reporting officer misconduct "outside the chain of command."

72.     Capt. Harrison then ordered a meeting with Sgt. Umenhofer, at which Sgt. Umenhofer objected to Capt. Harrison's critical comments, noting among other problems that applicable department policy prohibited Capt. Harrison from inserting comments in an evaluation period concerning events that took place outside of the same period.

73.     Capt. Harrison admitted to knowingly violating policy and reluctantly agreed to remove the comments.  Capt. Harrison then stated that he would instead write a disciplinary letter citing the same criticisms.

74.     Capt. Harrison also threatened to, and took action in furtherance of, removing Sgt. Umenhofer's duty as supervisor of the bike team.

75.     On or about March 30, 2010, Capt. Harrison delivered a disciplinary letter to Sgt. Umenhofer.  Among other things, Capt. Harrison referenced the E-Board letter, which Sgt. Umenhofer never saw, and criticized Sgt. Umenhofer's effort in bringing forward officer misconduct issues.

76.     On or about April 1, 2010, Sgt. Umenhofer met with Chief Smith and told him that Capt. Harrison was retaliating against him and creating a hostile work environment, and that Capt. Harrison's conduct was negatively impacting his health.

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
0000029911H073PL01

77.     On or about April 6, 2010, Chief Smith moved Sgt. Umenhofer out of Capt. Harrison's direct line of authority and back into an administrative position.

78.     Sgt. Umenhofer took two weeks off to improve his health conditions, and had less contact with Capt. Harrison.

79.     However, Capt. Harrison was not subjected to any disciplinary action for his retaliatory mistreatment of Sgt. Umenhofer.

80.     Shortly thereafter, the Internal Affairs Sergeant told Sgt. Umenhofer that a file involving a relative of Capt. Harrison was missing from the Internal Investigations office.

81.     In 2011, Sgt. Umenhofer took a complaint from security officers at a community event regarding the misconduct of Officer Spencer.   Officer Spencer had been representing the SWAT team, and according to the security officers, had engaged in conduct that would have gotten them fired if they had acted similarly.   Sgt. Umenhofer transmitted the complaint and later reviewed Officer Spencer's written response, which was inconsistent with the security officers' statement and appeared to be untruthful.

82.     Sgt. Rappe was assigned to investigate the situation and ultimately concluded that he could not prove that Officer Spencer had done anything wrong, because according to Sgt. Rappe, it was Officer Spencer's word against the word of two security officers.

83.     Sgt. Umenhofer told Capt. Lewis that he disagreed with Sgt. Rappe's conclusion and that Officer Spencer should not represent SWAT at community events.  Notwithstanding, Officer Spencer continued to do so.

84.     In or around January 2012, Mr. Grimaldi received an anonymous letter asserting several misconduct violations against Chief Smith, Capt. Harrison, and Sgt. Dave Lewis.  Mr.

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
0000029911H073PL01

Grimaldi forwarded the complaint to Chief Smith for follow up, which resulted in Chief Smith

clearing himself and the others of misconduct.

85.     In 2012, Sgt. Umenhofer received numerous complaints from officers and other

supervisors that Officer Spencer was mentally unstable and should not be on the SWAT team.

Sgt. Umenhofer forwarded those complaints – one of which included a detective telling Sgt.

Umenhofer that everybody knew that Officer Spencer had "murdered a kid and gotten away with

it" - to SWAT Sgt. Dave Lewis and his brother SWAT Captain Richard Lewis.

Notwithstanding, nothing was done.

86.     In 2013, Sgt. Umenhofer was informed that a pre-employment report concerning

Officer Spencer had been removed from an internal investigation file and was missing.

87.     In or around February 2013, Capt. Harrison informed Sgt. Umenhofer that he was

returning to patrol, and that Sgt. Charboneau was taking Sgt. Umenhofer's administrative

position.  Capt. Harrison then assigned Sgt. Umenhofer to day shifts, which was against his

stated preference of night shifts.  That assignment put Sgt. Umenhofer back under Capt.

Harrison's direct control.

88.     On or about March 5, 2013, City Manager Gino Grimaldi announced Chief

Smith's pending retirement, and stated that it was occurring so that Chief Smith could spend

more time with his family.

89.     Around the same time, several officers expressed to Sgt. Umenhofer their concern

that Capt. Harrison would become the next Chief of Police.  Also, Greta Utecht, the City's

Director of Human Resources, had stated her belief that Capt. Harrison would make a good

Chief.

Page 17 –  COMPLAINT

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
0000029911H073PL01

90.    Sgt. Umenhofer told Capt. Lewis about the officers' and his concerns.   In response, Capt. Lewis seemed disinterested and merely stated that anything could happen.

91.    Capt. Lewis's apathetic comment concerned Sgt. Umenhofer because Captain Lewis had vocally opposed Sgt. Umenhofer's reports of sexual misconduct and other ethical violations in the past.  Capt. Lewis had also engaged in apparently retaliatory conduct against Sgt. Umenhofer by excluding Sgt. Umenhofer from SWAT training and, on two occasions, had unreasonably refused to call out the SWAT team as back-up for Sgt. Umenhofer.

92.    As to the back-up situation, in responding to two separate calls of mentally unstable suspects armed with high-powered, military style assault rifles, Sgt. Umenhofer requested the SWAT team's assistance.  Capt. Lewis had directed Sgt. Umenhofer to just respond to the calls, and that if the situation "escalated," then he would call out the SWAT team.  In Sgt. Umenhofer's experience, Capt. Lewis's response was unreasonable and threatening because if the situation "escalated" it likely meant that the suspect had already taken shots at responding officers and, given the nature of the weapons involved, the standard bullet-proof vests issued by SPD would not protect him or other responding officers.

93.    On or about March 18, 2013, Sgt. Umenhofer requested a meeting with Mr. Grimaldi, which occurred a few days later.  At that meeting, Sgt. Umenhofer informed Mr. Grimaldi about the cover-up culture in the Police Department, that he had written documentation supporting that problem and that he would provide the information to him after Chief Smith left the Department in May.  Sgt. Umenhofer also told Mr. Grimaldi that Capt. Harrison had retaliated against Sgt. Umenhofer, and that Chief Smith had removed Capt. Harrison as his direct supervisor.  Sgt. Umenhofer also told Mr. Grimaldi that Capt. Harrison had recently arranged assignments such that he would again be Sgt. Umenhofer's direct supervisor.

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
0000029911H073PL01

94.    On or about April 8, 2013, Capt. Lewis informed Department managers that former Detective James had taken and released to Mr. Grimaldi and others a video showing Chief Smith kissing a subordinate City employee.  At that meeting, Sgt. Dave Lewis stated his view that the female employee shown kissing Chief Smith should be fired.  Capt. Lewis also stated that effective immediately, Chief Smith was no longer an employee and not allowed in the building.

95.    On or about April 9, 2013, Sgt. Umenhofer contacted Mr. Grimaldi and gave him a notebook full of documentation that contained a detailed description of all of the misconduct that Sgt. Umenhofer had raised over the years, including the names of additional witnesses and supporting documentation.  The notebook showed that Chief Smith, Capt. Harrison and Capt. Richard Lewis had established an unwritten policy, custom, and practice of cover-ups within the Police Department.

96.    At that meeting, Sgt. Umenhofer told Mr. Grimaldi that he feared for his safety and the safety of other officers he identified in his notebook who had reported misconduct.  Sgt. Umenhofer cautioned Mr. Grimaldi to handle the situation discreetly and to keep his and the other officers' identity confidential.

97.    The City then assigned Captain Richard Lewis to serve as the acting-Chief of Police until SPD could find a permanent replacement for Chief Smith.

98.    On or about April 17, 2013, Sgt. Umenhofer advised Mr. Grimaldi that he was concerned for his safety.

99.    A short time later, Mr. Grimaldi told Sgt. Umenhofer that he had provided a copy of the binder containing his reports of officer misconduct and ethical violations and supporting materials directly to acting-Chief Lewis and Capt. Harrison without Sgt. Umenhofer's consent.

Page 19 –  COMPLAINT

100.    In or around May 2013, Capt. Harrison, Sgt. Charboneau and Captain Lewis stopped speaking to Sgt. Umenhofer and otherwise directed anger at him.

101.    Capt. Harrison was "livid" with Sgt. Umenhofer for initiating these investigations.

102.    Around the same time, Capt. Lewis scrutinized Sgt. Umenhofer's use of overtime during a bike patrol for the Eugene Marathon, a practice that Sgt. Umenhofer had never before been questioned about.

103.    In or around May 2013, Sgt. Umenhofer had several meetings with Mr. Grimaldi and Greta Utecht, as well as the hired investigator, Gail Fischer, about the issues contained in his report.  Based on these meetings, and the reactions of Mr. Grimaldi and Ms. Utecht, which included Mr. Grimaldi repeatedly disclaiming any concerns that there ever was a conflict arising from the intimate relationship between Capt. Harrison and a human resources staff member who worked on SPD issues, Sgt. Umenhofer understood that they did not intend to take any meaningful action in response to his reports. On or about May 29, 2013, Sgt. Charboneau told others that Sgt. Umenhofer had reported that Capt. Harrison, Capt. Lewis and Sgt. Charboneau were corrupt.

104.    On or about May 29, 2013, Sgt. Umenhofer reported all of the issues, including Mr. Grimaldi's failure to take his reports seriously or respond to them appropriately, to the Mayor of Springfield.  Sgt. Umenhofer hoped that the Mayor would finally do something to correct the misconduct and ethical violations that were plaguing the Department.  However, the Mayor simply referred the matter back to Mr. Grimaldi.

105.    On or about May 31, 2013, Mr. Grimaldi told Sgt. Umenhofer that there needed to be a "change of culture" at the Police Department.  Yet, Mr. Grimaldi refused to effectuate any meaningful change.

Page 20 – COMPLAINT

106.    On or about June 9, 2013, the affair between Chief Smith and his subordinate become public knowledge as a result of being the subject of widespread news coverage. Contrary to his previous apathetic response to the sexual relationships that Sgt. Umenhofer had reported, Mr. Grimaldi changed his position by describing Chief Smith's relationship to the general public as "inappropriate" because Chief Smith had "power over the employee" with whom he was having the affair and that it was therefore "untenable."

107.    Sgt. Umenhofer was continuing to have serious concerns for his safety given the level of hostility that he was suffering and the fact that the individuals responsible for that retaliation could be responsible for providing back-up to him in an emergency response situation.

108.    The combination of the stress from the ongoing retaliation, fears about his personal safety, and the potential for additional acts of retaliation caused Sgt. Umenhofer to suffer from continued and highly elevated blood pressure, which was only managed with medication, acute anxiety, difficulty sleeping, invasive and intrusive thoughts and other symptoms consistent with Post Traumatic Stress Disorder ("PTSD").

109.    As a result of these symptoms, on or about June 13, 2013, Sgt. Umenhofer's physician placed him on a medical leave.  Sgt. Umenhofer remained on leave due to these symptoms until his termination from the SPD.

110.    On or about June 15, 2013, Mr. Grimaldi told the media that the investigation was over and that aside from two verbal reprimands of Capt. Harrison, nothing else would be done. He also claimed that he did not know who filmed Chief Smith or why, despite having been provided this information by Sgt. Umenhofer.

111.    In or around July 2013, acting-Chief Lewis makes Capt. Harrison the acting chief during his absence.

Page 21 – COMPLAINT

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
0000029911H073PL01

112.    In or around July 2013, an officer drew and circulated a cartoon picture of Sgt. Umenhofer putting knives in the back of several other employees.

113.    In or around August 2013, the City initiated an investigation into the retaliation that Sgt. Umenhofer experienced after Mr. Grimaldi forwarded Sgt. Umenhofer's written report to Capt. Harrison and Capt. Lewis.

114.    That investigation acknowledged that Sgt. Umenhofer's April 10, 2013 report constituted a protected report and that the matters contained in his reports "could be construed as corruption." However, the report ultimately failed to reach any definitive conclusions about Sgt. Umenhofer's retaliation concerns because it was incomplete – Sgt. Umenhofer was not interviewed, Mr. Grimaldi was not interviewed, and Sgt. Umenhofer's report on May 29, 2013, to the Mayor of Springfield, was not considered.

115.    On or about October 1, 2013, an ex-Eugene Police Department Captain Steve Swenson went to Sgt. Umenhofer's home and spent approximately one hour attempting to persuade Sgt. Umenhofer to "drop" his case against the City.   Former Capt. Swenson warned Sgt. Umenhofer, advising him to "to walk away" from the case and threatening that if Sgt. Umenhofer went forward, the City would make his "reputation toxic" and harm is future career. Former Capt. Swenson also warned that: "They will shoot holes in your back and make you walk the plank."   In response to Sgt. Umenhofer's concern about the consequences to the good officers at SPD if the supervisors' misconduct issues were "dropped," Former Capt. Swenson said: "Don't worry about them, they can take care of themselves."   Former Captain Swenson was friends with Capt. Harrison and Mr. Grimaldi.

116.    In or around October 2013, Officer Spencer was removed from the SWAT team.

117.    In or around late November 2013, Chief Doney became the new Chief of Police.

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
0000029911H073PL01

118.    On or about November 30, 2013, Sgt. Umenhofer drove to Medford, Oregon to deliver his notebook and a cover letter to new Chief Doney, stating among other things that:

> What was less known by the community at large was an atmosphere of intimidation and silence that [former Chief] Jerry Smith fostered and allowed to operate.  This ultimately led to a system of chronic favoritism and nepotism that has existed for far too many years.  This system continues to exist and revolves around those who have similar lifestyles and romantic practices as the former chief, as well as those who don't rock the boat and support the code of silence.  This "good ol' boy" system carried with it the tacit, if not expressed, approval of senior management of what was altogether clearly unprofessional and inappropriate behavior.
>
> . . .
>
> In my opinion those presently in the department's senior ranks that are perpetrators to the status quo cannot be rehabilitated.
>
> . . .
>
> I would be pleased and willing to meet with you in person to provide you with any additional information you may desire to help you in fixing the situation . . . It cannot repair itself – it needs to be fixed.

119.    In or around January 2014, Sgt. Umenhofer met with Chief Doney.  At the meeting, Chief Doney did not refer to or mention in any way Sgt. Umenhofer's November 30, 2013 letter and his notebook.  Instead, Chief Doney told Sgt. Umenhofer that retirement could be a "good thing" for him.

120.    Chief Doney and Captain Lewis had been friends since 2008.  Before applying for the open SPD position, Chief Doney spoke with Captain Lewis to learn more about the Department.

121.    Chief Doney maintained the status of the administrative team, with Sgt. Dave Lewis and his brother Capt. Richard Lewis remaining on the SWAT team and maintaining their supervisory roles, and Capt. Harrison and Sgt. Charboneau maintaining their supervisory positions.  Among other problems, this status-quo effort violated the City's recently adopted anti-nepotism policy.

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
0000029911H073PL01

122.    On or about April 4, 2014, Sgt. Umenhofer requested that the SPD provide him with an accommodation of the psychological condition caused by the stress surrounding his reports of misconduct, the City's inaction in the face of those reports, and the retaliation that he suffered and reasonably feared he would suffer as a result.  Sgt. Umenhofer's proposed accommodations included assigning him outside of Capt. Harrison's and other retaliatory supervisors' chain of command or reassigning him to work with a community partner law enforcement agency until Capt. Harrison left the force.  Sgt. Umenhofer also told the City that he would be willing to consider other reasonable accommodations that would protect his safety and psychological health.

123.    The City failed to meaningfully engage in the interactive process with Sgt. Umenhofer or to make any genuine efforts to accommodate his work-induced disability.  In that regard, the City merely and unilaterally claimed that all of the proposals offered by Sgt. Umenhofer would be "unreasonable" and failed to suggest any alternatives – even though other suitable, alternative long-term positions were available or about to become available in the near future, or that Sgt. Umenhofer could have been placed temporarily in other suitable positions pending Capt. Harrison's retirement in less than one month.  Instead, the City proposed that Sgt. Umenhofer accept reassignment as a janitor or a librarian. The City proposed these alternative positions as "accommodations" intending that Sgt. Umenhofer would not accept them.

124.    At that time, three possible alternative positions were available or soon to become so, all of which were commensurate with Sgt. Umenhofer's skills and abilities, as follows:  (1) the Director of the Springfield municipal jail; (2) an Investigator's position within the District Attorney's office; or, (3) a position with the Interagency Drug Team located within the Drug Enforcement Agency.

Page 24 –  COMPLAINT

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
0000029911H073PL01

125.    On June 9, 2014, the City terminated Sgt. Umenhofer's employment.

126.    In 2014, Chief Doney promoted Detective Jeff Martin into Sgt. Umenhofer's previous supervising position.

127.    Previously, Detective Martin had engaged in multiple acts of racially discriminatory conduct, such as calling or making statements implying that persons of Mexican heritage are consistently untruthful and referring to persons of Mexican heritage as "beaners." Detective Martin received a citizen complaint regarding his discriminatory language, which was known by Sgt. Charboneau and Capt. Harrison.  However, neither Sgt. Charboneau nor Capt. Harrison took any apparent disciplinary action against Detective Martin, and instead accepted Detective Martin's response that he could say whatever he wanted as it was his right to free speech.

128.    As a result of the defendants' retaliation, Sgt. Umenhofer has suffered significant economic and noneconomic damages in an amount to be specifically proven at trial.

129.    Sgt. Umenhofer has attempted to mitigate his damages.

## CLAIMS FOR RELIEF
## FIRST CLAIM FOR RELIEF
### (Violation of 42 U.S. C. § 1983 – Free Speech)
### (Against Gino Grimaldi in his Individual Capacity)

130.    Plaintiff John Umenhofer realleges the allegations set forth above, and in addition alleges the following.

131.    As set forth above, Defendant Gino Grimaldi was acting under color of State law as the City Manager for the City of Springfield.

132.    As set forth above, Sgt. Umenhofer engaged in free speech activities that are protected by the First and Fourteenth Amendments to the United States Constitution.  Sgt.

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
0000029911H073PL01

Umenhofer's free speech activities were made in his capacity as a private citizen and were on a matter of public concern.

133.    As set forth above, Mr. Grimaldi retaliated against Sgt. Umenhofer because of his protected speech activities by providing his reports of ethical violations directly to the subjects, by failing to take steps to ensure that Sgt. Umenhofer could return safely to his position, by refusing to meaningfully engage Sgt. Umenhofer in the interactive process, and by terminating his employment.  Mr. Grimaldi acted either intentionally or with deliberate indifference to Sgt. Umenhofer's federally protected rights, and his retaliatory acts violated Sgt. Umenhofer's clearly established constitutional rights of which a reasonable person would have known.

134.    As a result of this retaliation, Sgt. Umenhofer has suffered significant damages in an amount to be specifically proven at trial as set forth above.

135.    Sgt. Umenhofer is entitled to his reasonable attorney fees.

### SECOND CLAIM FOR RELIEF
**(Violation of 42 U.S. C. § 1983 – Free Speech)**
**(Against Gino Grimaldi and Timothy Doney in their Official Capacities)**

136.    Plaintiff John Umenhofer realleges the allegations set forth above and incorporates them by reference, and in addition alleges the following.

137.    As set forth above, Defendants Gino Grimaldi and Timothy Doney were acting under color of State law as the City Manager and the Chief of Police respectively.

138.    As set forth above, Sgt. Umenhofer engaged in free speech activities that are protected by the First and Fourteenth Amendments to the United States Constitution.  Sgt. Umenhofer's free speech activities were made in his capacity as a private citizen and were on a matter of public concern.

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
0000029911H073PL01

139.     As set forth above, Mr. Grimaldi and Chief Doney retaliated against Sgt. Umenhofer because of his protected speech activities by terminating his employment. Defendants acted either intentionally or with deliberate indifference to Sgt. Umenhofer's federally protected rights.

140.     Mr. Grimaldi and Chief Doney were the final decisionmakers pertaining to Sgt. Umenhofer's termination and, as such, their decision constituted a policy decision of the City. Additionally, the termination decision was taken according to an unwritten policy, custom, and practice within the Springfield Police Department of covering up official misconduct and ethical violations within the Department.

141.     As a result of this retaliation, Sgt. Umenhofer has suffered significant damages and is entitled to be reinstated to his position.

142.     Sgt. Umenhofer is entitled to his reasonable attorney fees.

### THIRD CLAIM FOR RELIEF
### (Violation of ORS 659A.200, *et seq.*)
### (Against City of Springfield)

143.     Plaintiff John Umenhofer realleges all of facts set forth above and incorporates them by reference, and in addition alleges the following.

144.     As set forth above, Sgt. Umenhofer engaged in protected activity by reporting to the Chief of Police, the City Manager, and the Mayor of Springfield evidence that he reasonably believed in good faith constituted a violation of state rules or regulations governing the conduct of police officers, mismanagement, abuse of authority, and a substantial and specific danger to public safety caused by SPD's actions.

145.     As set forth above, Defendant City of Springfield retaliated against Sgt. Umenhofer on account of that protected activity.

Page 27 –  COMPLAINT

146.    Sgt. Umenhofer was damaged by Defendants' retaliation in an amount to be specifically proven at trial.

147.    Sgt. Umenhofer is entitled to his attorney fees under ORS 659A.885.

## FOURTH CLAIM FOR RELIEF
### (Violation of ORS 659A.218)
### (Against City of Springfield)

148.    Plaintiff John Umenhofer realleges all of facts set forth above and incorporates them by reference, and in addition alleges the following.

149.    As set forth above, Sgt. Umenhofer engaged in protected activity under ORS 659A.203(1)(b).

150.    As set forth above, Defendant City of Springfield, through Gino Grimaldi and/or Greta Utecht, disclosed his identity to the subjects of his reports without his consent.

151.    Sgt. Umenhofer was damaged by Defendants' disclosure in an amount to be specifically proven at trial.

152.    Sgt. Umenhofer is entitled to his attorney fees under ORS 659A.885.

## FIFTH CLAIM FOR RELIEF
### (Violation of ORS 659A.103)
### (Against City of Springfield)

153.    Plaintiff John Umenhofer realleges all of facts set forth above and incorporates them by reference, and in addition alleges the following as an alternative claim for relief.

154.    Sgt. Umenhofer has a psychological condition that substantially limits one or more of his major life activities.

155.    Plaintiff John Umenhofer is a qualified individual who satisfies the requisite skill, experience, education and other job-related requirements of the employment position he was

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
0000029911H073PL01

terminated from and can perform the essential functions of such position with or without reasonable accommodations.

156.    Defendant City of Springfield unlawfully discriminated against Sgt. Umenhofer on the basis of disability in regard to discharge and other terms, conditions, and privileges of employment as follows:

  a.  Not making reasonable accommodations to his known mental limitations that would have enabled him to perform the essential functions of his position; Failing to engage in the interactive process;

  b.  Failing to offer him reasonable, alternative positions; and,

  c.  Unlawfully terminating his employment on the basis of disability.

157.    Sgt. Umenhofer's disability was the motivating factor of defendant's decision to terminate his employment.

158.    Defendant's unlawful acts have caused plaintiff economic damages in the form of lost income, benefits, and/or consequential damages.

159.    Defendant's unlawful acts have caused plaintiff significant noneconomic damages in the form of severe emotional distress and mental suffering.

160.    According to ORS 659A.885, Sgt. Umenhofer is entitled to his attorney fees under ORS 659A.885.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for the following relief:

1.    Judgment in his favor for monetary damages in an amount to be determined at the time of trial but currently estimated not to exceed $1,850,000;

2.    Punitive damages in an amount to be determined at the time of trial;

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
0000029911H073PL01

3.     An injunction ordering Defendant to reinstate Plaintiff to his former position or an alternative equivalent position;

4.     Plaintiffs' reasonable attorney fees in pursuing this action;

5.     Plaintiffs' costs and disbursements; and

6.     Any other relief the Court deems is just and equitable under the circumstances.


DATED this 6th day of October, 2014.


HAGLUND KELLEY LLP


By: /s/ Christopher Lundberg
Christopher Lundberg, OSB No. 941084
Email:  clundberg@hk-law.com
Matthew E. Malmsheimer, OSB No. 033847
Email:  mmalmsheimer@hk-law.com
Attorneys for Plaintiff

HAGLUND KELLEY LLP
ATTORNEYS AT LAW
200 SW MARKET STREET, SUITE 1777
PORTLAND, OR 97201
0000029911H073PL.01